UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIJIAK WIE WONG,<br><br>    Petitioner,<br><br>    v.<br><br>D. SAMUEL,<br><br>    Respondent. | No. 2:22-cv-1839 DAD CKD P<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. Following a Sacramento County jury trial, petitioner was found guilty of four counts of assault with a deadly weapon, false imprisonment, and possession of tear gas by a felon. On February 5, 2016, petitioner was sentenced to 33-years-to-life imprisonment. ECF No. 11-2 at 81-84. Here, petitioner presents two claims. For the reasons which follow, the court will recommend that petitioner's petition for a writ of habeas corpus be denied.

I. <u>Background</u>

On direct appeal, the California Court of Appeal summarized the evidence presented at trial and other relevant facts as follows:

> On the morning of September 21, 2014, 18-year-old Junior V. picked up his cousin, 19-year-old Christopher V., in his grandfather's Chevy Lumina sedan. Christopher suggested they go to SD Mart, an indoor flea market, and Junior agreed. They shopped at the mart for about 20 minutes but neither made a

1

purchase. Christopher wanted to leave. As they walked back to the car, he told Junior that he had changed his mind and wanted to buy something. Christopher suggested that Junior bring the car close to the side entrance so he wouldn't have to walk all the way back to where it was parked. Junior got the car and parked it at the side entrance where Christopher had suggested they meet. Junior turned the ignition off and was "looking at stuff" on his phone when Christopher ran out of the mart, yelling, "Go, go, go," as he jumped in the car. Junior saw two men chasing and yelling at Christopher but could not hear what they said. Junior drove off as fast as he could.

The two men in pursuit, later identified as defendant and Ki Kim, got into a blue truck and followed Junior's car at a distance of 10 to 15 yards. Junior was going "maybe 45 miles" per hour on Mack Road. As they approached the next light he braked gradually to 25 to 30 miles per hour to make a right turn. After he completed the turn onto Center Parkway, and while going about 40 miles per hour he heard a loud bang and felt a "pretty violent crash" to his rear bumper. According to Junior, "I, obviously I heard it. There was a loud bang. Both me and my cousin jerked forward. Our heads kind of like whip-lashed. And basically I knew we were hit. I didn't know what the damage was. I couldn't really tell because I['ve] never been in that situation before." Junior later pointed to damage on the vehicle from the hit on a photograph.

Junior kept going with the truck right behind them and took the first turn into a residential neighborhood. Going about 30 to 40 miles per hour, Junior braked to slow down in order to safely turn left at a corner. Before making the turn, he looked to find the blue truck, which was not as close as it had been. He thought there was enough distance to safely brake left onto the residential street. He then felt the truck crash into the back of his car.

According to Junior, "this time it was a bigger crash. I felt the truck going straight into the back of the car. And at that point we hadn't completed the turn. So basically we were facing the house that was on that, you know, corner street. We were facing that house. And I broke as soon as the car hit. I broke but it wasn't enough." He was headed initially toward a big tree but then he "swerved the wheel to the right and then that was the house." His foot was on the brake the whole time. The car stopped inside the living room of the house. He had "sort of a sick feeling," like he felt when he had a concussion before.

Junior got out of the car, heard yelling, and saw Christopher pinned down by defendant who had driven the truck, and being kicked by Kim.[1] Junior had not seen the beginning of the altercation since Christopher had exited the car before Junior. Defendant pinned Christopher down with his knees on Christopher's head and tried to handcuff him while Christopher was yelling to get off. Christopher

---

[1] Junior admitted that an earlier statement he gave to officers prior to trial that he had also seen the men punch Christopher 10 times was not true.

2

was handcuffed from behind. Defendant then told Junior to sit down and Junior complied. Junior saw mace on Christopher's clothing.

Junior identified a gold watch worth $500 and a mace spray can he had seen at the accident scene. After he was interviewed by the police, he went to the home of his grandparents who took him to the hospital where he was treated and released. At the time of trial, he complained of neck pain. After the accident, Junior kept his distance from Christopher because Christopher had stolen the watch that led to the collision.

Christopher testified he remembered that he stole a watch from a store but claimed he did not remember the collision into the house. He denied having discussed his intent to steal with Junior. After Christopher took the watch, he ran to Junior's car and denied seeing anyone chasing him. When he reached the car, Junior drove away. He denied seeing anyone pursuing them. He did not recall being hit by another car and never felt any other car striking them. He recalled that they crashed into a house, he hit his head on the dashboard, and he blacked out. He denied remembering anything else. He did not recall speaking to an officer. Christopher admitted that he and Junior went to SD Mart and he had Junior wait in the car while he bought a shirt. He denied telling an officer that he took a watch and ran out of a store. He admitted that when he jumped into the car, he told Junior to "go" but denied anyone was chasing him. He denied having told an officer that the truck hit the car or that he said, "My cousin lost control, and we hit the house."

Christopher remembered being "burned" from pepper spray but did not recall how it occurred. He denied telling an officer that two men punched him five to 10 times in the face, maced him, and handcuffed him. Christopher claimed he was under the influence at the time. He admitted that he had obtained immunity from prosecution for stealing the watch.

Larry Farley was standing outside when he heard the sound of tires screeching. He saw a car traveling toward him with a truck following very closely. The car turned and went into a house on the corner. Farley was not sure whether the truck hit the car. Reviewing his statement to the police wherein he stated that the truck hit the car and sent it out of control into the house, Farley stated that he never saw the car actually complete its turn before going into the house, instead, it was during the turn. Farley did not recall whether the car slowed down when it made its turn. Farley recalled telling the officer that the car was traveling at 50 to 60 miles per hour with the truck following it. Farley did not know whether the car accelerated into the house or was pushed into the house by the truck. There were speed bumps on the road from which the car was turning.

After the car drove into the house, Farley saw the truck pull up behind the car in seconds, and defendant got out. Defendant began struggling with someone (Christopher) who Farley believed was being held down. Farley thought there was a third person but was

3

> unclear as to what he was doing. Farley did not hear what was being said. Farley did not see anyone hit, punch, or kick Christopher.
>
> Roger Zanzi was inside his house when the car drove through the exterior wall. He was temporarily trapped but not hurt. Zanzi saw someone run from the car across the yard—a 19-year-old Hispanic man—and someone else—an Asian man in his 20's to 30's—chasing him, grabbing him, and then a struggle with the Hispanic man trying to fight to get away. One man pulled the other man to the ground and handcuffed him. Zanzi never saw mace being used.

ECF No. 15-2 at 2-6.

II. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. See <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the

4

> state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). Here, the only reasoned decision was issued by the California Court of Appeal. ECF No. 15-2.

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III. Claims and Analysis

    A. Denial of Immunity from Prosecution for Ki Kim

Petitioner claims his Constitutional rights were violated when the trial court failed to grant Ki Kim prosecutorial immunity with respect to any testimony provided by him as to the events at issue. The California Court of Appeal, the last court to issue a reasoned decision as to this claim, addressed the claim as follows:

> All four of the players in this drama were potential criminal defendants: Junior and Christopher for the theft of the watch, Kim and defendant for the assaults arising from the pursuit, and defendant also for possession of the pepper spray. The People chose to forego prosecution of the theft and offered immunity to Junior and Christopher to facilitate their testimony on the People's behalf. Given the prosecution's focus, no immunity was offered

defendant, the principal in those offenses, nor was it offered to Kim. The prosecution explained that while Kim made statements that would have been helpful to the prosecution, they were not willing to offer immunity "based on his participation in everything that followed the robbery." He was "essentially an aider and abettor in the entire incident."

Defendant sought to call Kim as a witness and moved that Kim's testimony be given under a grant of judicial immunity. At an Evidence Code section 402 hearing defense counsel presented two statements given by Kim to law enforcement. The court summarized the two statements on the record as follows.

In the initial statement Kim indicated that he worked for a cousin at a store called Gold USA and that Christopher came in wanting to look at a watch. Kim took the watch out of the display case and handed it to Christopher. Christopher ran out of the store. Kim gave chase, joined by defendant who was in the parking lot. Christopher jumped into a gold car with its engine running. Kim and defendant got in the defendant's truck and pursued. Defendant struck Junior's vehicle twice. Ultimately, as the vehicle was making a left-hand turn and slowing down, the truck struck the back of the car and the car went into the house. He did not remember defendant braking or hearing any brakes screeching. After the crash, Christopher came out and there was a fight, started by Christopher. Then defendant sprayed Christopher with pepper spray and put handcuffs on him. Defendant took the watch.

In a subsequent statement, made three and one-half months later Kim said that "Mr. Wong," presumably the defendant, was the manager at SD Mart. A robber stole a watch from a store and an employee at Gold USA ran after the thief. Kim ran out to the parking lot as defendant was coming out of the Dollar Store. There was a driver in the car waiting for the robber. Defendant told Kim to get in the car and asked Kim "What's going on?" Kim told him the watch had been stolen. Kim's statement mentions calling 911 and at that moment the "accident happened." Defendant hit the rear of the car being pursued. Kim hung up from the 911 call. The car continued and was making a left-hand turn, slowed down abruptly, and defendant struck the back of the car once and the car went into the house. Kim and defendant got out. The robber came close with the watch. Defendant took the watch. The robber grabbed Kim's hair and the two fell to the ground together. Defendant gave Kim handcuffs to use on Christopher. Kim didn't know how so ultimately defendant handcuffed Christopher.

Defendant's counsel submitted a written motion and argued orally. He complained that the police investigation was incomplete, taking a statement from a non-English-speaking person. He complained "there wasn't the level of detail that would have been assumed" and there were "issues even with interpretation." He thought that "Mr. Kim has a lot of exculpatory and granted maybe even inculpatory." The "most problematic piece of information that [he would] like the jury to hear" was that the car actually slowed abruptly. He also mentioned Kim's hair being pulled and mutual combat. He

6

complained about the immunity given to prosecution witnesses but "no immunity given to someone who has no criminal background and is a student at UC Davis, an economics major."

The People took the position that Kim was essentially "an aider and abettor in the entire incident"; he essentially aided in the assault while defendant held the victim down. Statements in his original statement incriminated defendant, indicating he made no effort to brake. "[W]e are not willing to give him immunity based on his participation in everything that followed the robbery."

Defendant's argument on appeal essentially mirrors his argument before the trial court. Noting that the prosecutor granted immunity to Christopher, the admitted robber, but refused to grant immunity to Kim, defendant discounts Kim's initial statement in which he stated defendant struck Junior's car twice and he did not recall defendant braking before hitting the car, because it was taken without the aid of a translator, but credits the second statement given with the assistance of a translator to correct facts misstated in the first statement. In the second statement he indicated the car "was slowing down abruptly to make a left-hand turn" when hit by defendant's truck. The second statement also mentions that Kim called 911 at the moment the truck hit the car a second time and mentioned that Christopher grabbed Kim's hair when the two were out of their respective vehicles.

Defendant acknowledges the absence of clear authority in California for the grant of immunity by a trial court, but cites cases in which the Supreme Court recognized that "a judicially conferred use immunity might possibly be necessary to vindicate a criminal defendant's rights to compulsory process and a fair trial." (*People v. Hunter* (1989) 49 Cal.3d 957, 974.) Subsequent to trial in this matter, our Supreme Court decided *People v. Masters* (2016) 62 Cal.4th 1019 (*Masters*), holding that California courts have no authority to confer use immunity on witnesses. The court noted that "'the power to confer immunity is granted by statute to the executive'" and "'prosecutors are not under a general obligation to provide immunity to witnesses in order to assist a defendant,'" but in appropriate circumstances due process may compel a defense witness to be immunized by the prosecution. (*Id*. at pp. 1051-1052.) The appropriate circumstances require a finding of prosecutorial misconduct—"'intemperate behavior [that] is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of [federal] due process.'" (*Id*. at p. 1052.)

Without adopting them as California standards, the Supreme Court set forth the factors articulated in two federal cases, *Government of Virgin Islands v. Smith* (3d Cir. 1980) 615 F.2d 964, 972 and *U.S. v. Quinn* (3d Cir. 2013) 728 F.3d 243, 251-257, to evaluate claims of prosecutorial misconduct: "'[Witness immunity was] properly sought in the district court; [2] the defense witness [is] available to testify; [3] the proffered testimony [is] clearly exculpatory; [4] the testimony [is] essential; and [5] there [are] no strong governmental interests which countervail against a grant of immunity.'" (*Quinn*,

7

> *supra*, at p. 251, quoting *Smith*, *supra*, at p. 972.)
>
> Referring to California rules on prosecutorial misconduct, the court pointed out "Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (*Masters*, *supra*, 62 Cal.4th at p. 1052.) Under the facts before it, the court concluded it could not characterize the prosecutor's refusal to grant immunity as "egregious, unfair, deceptive, or reprehensible" and thus the refusal was not misconduct. (*Id*. at p. 1053.)
>
> Like the Supreme Court, we cannot find defendant's request for Kim's immunity is compelled by either federal decisions or by California rules on prosecutorial misconduct. It is not the rule that immunity must be granted whenever a potential witness can offer relevant and helpful testimony to a defendant. Under federal authorities, the testimony must be "essential" and under California authorities the refusal to offer immunity must be "egregious, unfair, deceptive, or reprehensible."
>
> In support of his motion, defendant's counsel insisted that Kim "was literally a living video camera sitting next to [defendant]." Not so. Kim was no video recorder but a human relating his perception and memory of the events that unfolded. Humans cannot read minds or record intent. His testimony was far from unassailable. His initial account of the events was consistent with that of Junior, the principal prosecution witness who testified defendant rammed his vehicle into Junior's car, and while Kim could claim that his initial account was a misunderstanding, that claim was itself a matter of dispute. In any event, his was not the only account. There were other witnesses who offered their perceptions of what happened and some of those perceptions assisted defendant. Indeed, the testimony of Christopher, the alleged thief, was equivocal. Kim's testimony might have also been helpful to defendant's cause but, with or without Kim's testimony, the testimony of other witnesses established defendant's guilt. And there was nothing unfair or reprehensible about a prosecutor's refusal to accord immunity to a person who arguably aided and abetted the same offenses as the defendant. The prosecution is not required to forego prosecution of a person whose testimony, if believed, might assist an accomplice, particularly where other witnesses were available and testified to the facts at issue.
>
> We thus agree with the trial court and reject defendant's claim.

ECF No. 11-10 at 6-10.

First, the court notes that the Supreme Court has never held that a trial court has any obligation, or even authority, to grant a witness immunity from prosecution. This being the case, petitioner's claim that he is entitled to habeas relief because the trial court did not grant immunity

8

is barred by 28 U.S.C. § 2254(d).

As for whether petitioner's Constitutional rights were violated by prosecutorial misconduct, the Supreme Court has found that prosecutorial misconduct violates the Due Process Clause when the conduct results in the denial of a fair trial. Smith v. Phillips, 455 U.S. 209, 219 (1982). Other than that, the Supreme Court has never addressed when a failure to grant a witness immunity from prosecution violates due process. As indicated above, the Court of Appeal identified a standard utilized by the Third Circuit in evaluating whether a fair trial was denied as a result of the prosecution's denial of an award of immunity from the prosecution to Ki Kim. Use of that standard is not contrary to the Supreme Court's edict that the actions of the prosecution cannot result in a denial of a fair trial or any other precedent established by the Supreme Court nor is the result reached by the Court of Appeal an unreasonable application of Supreme Court precedent. Finally, the decision is not based on an unreasonable determination of the facts.

For all of these reasons, any claim petitioner might have that the prosecution's failure to grant Ki Kim immunity amounted to prosecutorial misconduct in violation of federal law is barred by 28 U.S.C. § 2254.

B. Denial of Instruction Requested by Defense Counsel

In his second claim, petitioner asserts his Constitutional rights were violated when the trial court denied petitioner's request for a CALCRIM 3404 jury instruction. The California Court of Appeal, the last court to issue a reasoned decision as to this claim, addressed the claim as follows:

> Near the end of trial testimony, and during a discussion about possible jury instructions, defendant's counsel indicated that he believed an instruction on accident would be appropriate. The court expressed the view that "as far as the accident, there is no evidence yet, not that I have heard of yet," and following the testimony of two additional witnesses unrelated to that issue, the court later denied the request. Counsel presented no argument in support of the request for an accident instruction, but in closing argument urged, without objection, that defendant was not guilty because any contact between the two vehicles was accidental. He asserted that defendant had multiple opportunities to ram Junior's car at stop signs along the way but did not, so the contact at the end of the chase must have been accidental. Counsel also questioned whether the jury could "know beyond a reasonable doubt that [defendant] was driving. And then even if he was, did he willfully aim his car at [Junior's] car?"

9

> On appeal, defendant argues the court erred in refusing to give CALCRIM No. 3404, as follows:
>
> "The defendant is not guilty of <*insert crime[s]*> if (he/she) acted [or failed to act] without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of <*insert crime[s]*> unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent."
>
> Defendant cites to the principle that "When a legally correct instruction is requested, however, it should be given 'if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.'" (*People v. Wilkins* (2013) 56 Cal.4th 333, 347, citing *People v. Marshall* (1997) 15 Cal.4th 1, 39.) In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt. *(People v. Ramirez* (1990) 50 Cal.3d 1158, 1180.)
>
> The People insist there was not substantial evidence to support the instruction. Clearly, defendant struck Junior's vehicle twice with substantial force. There was no evidence that defendant forwent earlier opportunities to ram the car—no evidence of stop signs that would have provided such opportunities. Moreover, according to the People, given the speed at which the vehicles were traveling and the closeness of defendant's pursuit, it could not be claimed that any collision was an accident. Rather, it was an event almost certain to happen.
>
> We are also persuaded by the People's argument that any error was harmless. Error in refusing to give a pinpoint instruction requires reversal "only if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Wilkins*, *supra*, 56 Cal.4th at p. 349.) Defendant was permitted to argue that collision with Junior's vehicle was not intentional but an accident. His argument failed not for lack of a pinpoint instruction but because the evidence established a deliberate effort to run Junior off the road. Defendant succeeded in that effort at a point in the pursuit where the vehicle was placed on a trajectory that sent it off the road, missing a tree but ending in a house, all at great risk to the occupants of the vehicle and the house.

ECF No. 11-10 at 10-12.

State court instructional error does not provide a basis for relief under federal law unless the error "so infected the entire trial that the resulting conviction violates due process." See Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). In determining whether a violation of the Due Process Clause has occurred, the error

10

must be viewed in light of the trial record including the instructions that were given.  See Estelle, 502 U.S. at 72; Cupp, 414 U.S. at 147.  Also, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (citation omitted).

Here, jurors were told that in order to find petitioner guilty of assault with a deadly weapon, they had to find that petitioner acted willfully (ECF 11-1 at 185), negating the possibility that mere accident could support a conviction for that offense.   This being the case, jurors were informed correctly as to California law and nothing stood in the way of counsel for petitioner arguing that accident negated the requirement of willful action or jurors making that finding.  Nothing under federal law required that the trial court define accident any further.  For these reasons, petitioner is not entitled to relief as to his claim of instructional error.

Furthermore, relief is precluded under 28 U.S.C. § 2254(d) as: (1) the rejection of petitioner's federal claim is neither contrary to, nor based upon an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States; and (2) there is not a showing that the decision rejecting the claim is based on an unreasonable determination of the facts.

IV.  Conclusion

For all of the foregoing reasons, the court will recommend that petitioner's petition for a writ of habeas corpus be denied, and this case be closed.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's petition for a writ of habeas corpus be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of

the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 30, 2023

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
wong1839.157